IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| Plaintiff, | § § | |
| and | § § § | |
| ANITA BIRKNER, | § § | CIVIL ACTION NO. H-09-3062 |
| Plaintiff-Intervenor, | § § § | |
| v. | § § | |
| GUARDSMARK, LLC, | § § | |
| Defendant. | § | |

<u>MEMORANDUM AND ORDER</u>

Pending is Defendant Guardsmark LLC's Motion for Partial Summary Judgment (Document No. 87).  After careful consideration of the motion, responses, replies, oral arguments, supplemental proof and submissions, and the applicable law, the Court concludes for the reasons that follow that the motion should be granted.

I.  <u>Background</u>

A portion of the factual background for this employment discrimination case may be found in this Court's Memorandum and Order dated December 22, 2010 (Document No. 86).  Plaintiff-Intervenor Aneda Birkner ("Birkner") was employed as a security

guard for Guardsmark, LLC, a national provider of security guard services, including to businesses in the Houston, Texas area.[1] Guardsmark bids or negotiates contracts for a variety of security services variously required by their clients and individualized for each of their clients' own business locations.  Guardsmark may pay different wages for security guard positions at different client locations, depending upon the contract requirements and specifications, and the rates that Guardsmark is able to negotiate for itself with each individual client.[2]  It is uncontroverted, however, that Guardsmark pays the same hourly rate for all non-supervisor guards, men and women, at each particular client location.

Guardsmark hired Birkner for $10.00 per hour in November 2006 to work the second shift, four to five days per week, at Gulf States Toyota's vehicle processing center.[3]  Gulf States Toyota's own managers oversaw the security detail and contracted with Guardsmark to supply 11 guards and one manager for the second and third shift duties.[4]  The Gulf States Toyota vehicle processing center, located at 20412 East Hardy Road, in Houston zip code 77073, consists of more than 35 acres, and is used to store

---

[1] Document No. 102, ex. C ¶ 1 (First Alba Decl.).

[2] Document No. 111, ex. C ¶ 4 (Second Alba Decl.).

[3] Document No. 15 ¶ 7 (Intervenor Complt.)

[4] Document No. 102, ex. C ¶¶ 4-5.

hundreds of new vehicles pending transportation to dealerships.[5] Security guards at this location were required, among other things, "to man the front gate, check in people coming in and out of the gate . . . count the cars coming in and out," account for the cars by tracking them with electronic bar codes, ride the perimeter of the property, and check the buildings.[6]  Terry Shaffer and his supervisor, Randy Sartain, were both employed by Gulf States Toyota and were the immediate Gulf States Toyota security guard supervisors who interacted with Guardsmark security officers and managers.[7]  Jimmy Pruett, a Guardsmark employee, was Birkner's Guardsmark supervisor while she was assigned to work at the vehicle processing center.[8]  Michael Thomas was Guardsmark's account manager in charge of the Gulf States Toyota account; he visited the Gulf States Toyota site, as well as the other sites of accounts he managed, "from time to time."[9]

Guardsmark also had a contract to furnish three security guards to Gulf States Executive Offices, separately located at 7701 Wilshire Place Drive, in Houston zip code 77040.  Guardsmark paid

---

[5] Document No. 87 ¶ 3.

[6] Document No. 91, ex. 2 at 171:16-25, 172:1-16 (Birkner Depo.).

[7] Document No. 102, ex. 3 ¶ 5.

[8] Id. ¶¶ 7, 11; Document No. 91, ex. 2 at 80:15.

[9] Document No. 102, ex. 3 ¶¶ 7,11; Document No. 91, ex. 2 at 80:15.

$10.50 per hour to guards posted in the Executive Offices.[10]   The guards at this location were required to monitor people entering the building; issue visitor tags to visitors; call the proper Gulf States employees to inform them of the visitor; interact with the public; and secure the building.[11]

About early March 2007, Guardsmark transferred two women, Dreama Chaney and Danielle Jones, from Gulf States Toyota vehicle processing center to the business location of Expediters International, another of Guardsmark's clients, located at 18225 Humble Parkway, in Humble zip code 77338.   Guardsmark paid $9.00 per hour to its guards at Expediters.[12]   Soon thereafter, rumors began to circulate that the Gulf States Toyota supervisors did not want women working at their site and had requested that women be transferred to other Guardsmark client posts.[13]   Birkner called Thomas to express her concern over the rumors and to ask if they were true.[14]   According to Birkner, he told her not to worry about rumors and that he was the one who could make that decision, not Gulf States Toyota.[15]   A few weeks later, Birkner was also

---

[10] Document No. 91, ex. 4 at 144:10-25 (Thomas Depo.).

[11] Id. at 26:13-22.

[12] Document No. 91, ex. 1 ¶ 11 (Birkner Decl.); Document No. 15 ¶ 7.

[13] Document No. 91, ex. 1 ¶ 13.

[14] Id. ¶¶ 15-16.

[15] Id.

transferred to the Expediters location.[16]   Birkner alleges that
Thomas told her at that time that she and the other women were
transferred because the supervisors at Gulf States Toyota did not
like having women at their post, and that Guardsmark had to move
the women or risk losing the account.[17]   Thomas denies that any such
conversation ever occurred.[18]   Phyllis Reed, another Guardsmark
supervisor, told Birkner that the Expediters job would be for only
a month and then she could return to Gulf States Toyota.[19]   A month
later, however, Reed told Birkner that she was better off at
Expediters, and that if she needed more money she should get a
second job.[20]

About the beginning of April 2007, Birkner called the 1-800-
number listed on her Guardsmark diversity policy to complain about
the alleged discrimination, and allegedly was told to speak with
her supervisor or with the EEOC.[21]   She then filed a charge of
discrimination with the EEOC on April 23, 2007.[22]   She filed another

---

[16] Id. ¶¶ 19-21.

[17] Id.

[18] Document No. 91, ex. 4 at 107:15-25 (Thomas Depo.).

[19] Document No. 91, ex. 1 ¶¶ 29-31.

[20] Id. ¶¶ 33-34.

[21] Document No. 91, ex. 2 at 91:14-94:16; 163:22-167:20.

[22] Document No. 15 ¶ 6; Document No. 91, ex. 14 (EEOC Charge).

detailed statement on July 3, 2007, in response to Guardsmark's position statement.[23]

Later that same month, Adrian Rawls, Guardsmark's account manager in charge of the Expediters account, called Birkner to ask if she would cover a job at T-Mobile, working through the night from around midnight to 8 a.m. at a T-Mobile store that was under construction in a shopping center in Cypress, Texas.[24] Guardsmark paid $12.00 per hour to its guards at T-Mobile's location, and Birkner agreed to take this extra shift. When Birkner arrived on site to guard the store, the client informed her that she would have to stay in her vehicle and guard the store from outside due to sensors that were activated inside the store.[25] She was to go to a local restaurant if she needed to take a bathroom break.[26]

On Birkner's third night on the T-Mobile job, she took a bathroom break around 3 a.m.[27] When she returned, she saw police at the site because the store had been burglarized while Birkner was away.[28] Birkner did not approach the scene or talk to police,

---

[23] Document No. 91, ex. 15.

[24] Document No. 15 ¶ 15; Document No. 93, ex. 18.

[25] Document No. 91, ex. 2 at 211:19-25.

[26] Id., ex. 2 at 199:7-206:22.

[27] Document No. 91, ex. 2 at 209:14-19.

[28] Id.

but left in her car and went home.[29]  She did not return to the store, even after Rawls called her at 7 a.m. the following morning to find out where she was and to ask her to go back.[30]  Because Birkner was found to have abandoned her post, Guardsmark terminated her on or about July 14, 2007.[31]

Birkner intervened in this suit against Guardsmark on November 12, 2009.[32]  Guardsmark now moves for partial summary judgment on Birkner's EPA, Title VII discrimination in compensation[33] and retaliation claims, (Counts One, Two, and Four, respectively), arguing that Birkner: (1) has failed to establish that she was paid less than similarly situated male employees; and (2) cannot establish a *prima facie* case showing that Guardsmark retaliated against her for engaging in protected activity.

Birkner counters that she has established a *prima facie* case under the EPA and Title VII for discrimination in compensation, and

---

[29] Document No. 91, ex. 2 at 212:19:25.

[30] Document No. 91, ex. 2 at 199:7-210:25; 210:15-25.

[31] Document No. 91, ex. 2 at 215:14:25 (Birkner Depo.).

[32] Plaintiff EEOC settled with Guardsmark on November 5, 2010. *See* Document No. 81 (Consent Decree).

[33] Guardsmark does not move for summary judgment on all of Count Two, "Disparate Treatment," but only the compensation discrimination portion thereof, leaving Birkner's disparate treatment claim for her transfer intact. *See* Document No. 102 at 2 n.2; *see also* Document No. 15 at 5.

that Guardsmark has not presented evidence to rebut those claims.[34]
Further, Birkner argues that she has established a *prima facie* case
of retaliation, and that Guardsmark's legitimate, non-
discriminatory reason for terminating her is pretext.[35]

## II.  Summary Judgment Standard

Rule 56(a) provides that summary judgment should be rendered
"if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of
law." FED. R. CIV. P. 56(a).  The moving party must "demonstrate
the absence of a genuine issue of material fact." Celotex Corp. v.
Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the
nonmovant to show that summary judgment should not be granted.
Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th
Cir. 1998).  A party opposing a properly supported motion for
summary judgment may not rest upon mere allegations or denials in
a pleading, and unsubstantiated assertions that a fact issue exists
will not suffice.  Id.  "[T]he nonmoving party must set forth
specific facts showing the existence of a 'genuine' issue
concerning every essential component of its case."  Id.

---

[34] Document No. 104 at 10-16 (Birkner's Response).

[35] Id. at 21-25.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." <u>Id.</u> Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

### III.  <u>Equal Pay Act</u>

The Equal Pay Act ("EPA") prohibits an employer from discriminating against its employees on the basis of sex by paying wages to employees of one sex "in such establishment at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex" for equal work on jobs that require "equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ." 29 U.S.C. § 206(d)(1). To establish

a *prima facie* case under the EPA, Birkner must produce evidence to show that: (1) her employer is subject to the EPA; (2) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than the employee of the opposite sex providing the basis of comparison.  <u>Chance v. Rice Univ.</u>, 984 F.2d 151, 153 (5th Cir. 1993); <u>Jones v. Flagship Int'l</u>, 793 F.2d 714, 722-23 (5th Cir. 1986).

Once a plaintiff has established a *prima facie* case, the burden shifts to the employer to "prove by a preponderance of the evidence that the wage differential is justified under one of the four affirmative defenses set forth in the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor than sex." <u>Siler-Khodr v. Univ. of Tex. Health Science Ctr. San Antonio</u>, 261 F.3d 542, 546 (5th Cir. 2001).

Guardsmark argues that Birkner has failed to establish a *prima facie* case because there is no evidence that she performed work but was paid less than men performing equal work in a position requiring equal skill, effort, and responsibility under similar working conditions.

A foundational dispute between the parties is whether the various business locations of the various clients at which Guardsmark supplies guards to discharge a variety of duties, all

10

constitute one "establishment" within the meaning of the EPA.  A plaintiff must show an equal pay act violation within a single establishment.  29 U.S.C. § 206(d)(1).  "Establishment" refers to a "distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business.  Accordingly, each physically separate place of business is ordinarily considered a separate establishment." 29 C.F.R. § 1620.9(a); *see also* Meeks v. Computer Assoc. Int'l, 15 F.3d 1013, 1017 (11th Cir. 1994).  However,

> [U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions. Barring unusual circumstances, however, the term "establishment" will be applied as described in subsection (a) of this section.

29 C.F.R. § 1620.9(b).  The Fifth Circuit has held that a business with multiple locations can be considered a single establishment under unusual circumstances where centralized management of job duties and a high degree of interaction between the physically separated places of business exists. *See, e.g.*, Marshall v. Dallas Ind. Sch. Dist., 605 F.2d 191, 194 (5th Cir. 1979) (school district is a single establishment); Brennan v. Goose Creek Consol. Ind. Sch. Dist., 519 F.2d 53, 57 (5th Cir. 1975) (same); *see also* AFSCME

v. Cnty. of Nassau, 609 F. Supp. 695, 705-07 (E.D.N.Y. 1985)
(finding that the county was a single establishment).

The Fifth Circuit's precedents in Dallas Ind. Sch. Dist. and
Goose Creek Consol. Ind. Sch. Dist. are examples of the *exception*
to the usual rule, that is, what the regulation refers to as
"unusual circumstances" where two or more "distinct physical
portions of a business enterprise" may be treated as "a single
establishment." 29 C.F.R. § 1620.9(b). Both cases involved
janitorial employees. Unlike this case, at all of the schools in
the school district cases there is a unity of ownership of all the
sites, a common business purpose, a likeness of the functions
performed at each location, and a uniformity of the individual
daily duties and responsibilities of the janitorial employees.
*See* Goose Creek Consol. Ind. Sch. Dist., 519 F.2d at 56 ("[T]he
work schedule and the janitors' daily duties--controlled to a large
extent by the central administrators--do not differ from building
to building."); Dallas Ind. Sch. Dist., 605 F.2d at 194 ("Delivery
of custodial and maintenance service to all of DISD's schools is
controlled by the office of the Superintendent for Support Services
. . . . All custodial and other salaries are paid by the central
administration, and there is no differentiation in pay based upon
the building in which the employees work.").

In sharp contrast, Guardsmark provides guard services at
locations owned not by Guardsmark but by its clients, it has no

interest in its clients' diverse business purposes at its clients' establishments, it has nothing to do with the particular functions being performed by its clients at those locations, and the various and sundry daily duties and responsibilities of the guards assigned by Guardsmark to each different client site are prescribed by each individual client to meet the needs that are unique to that client's business and property.  Each guard is subject to the management of the client at the client's location to which she is assigned.  The clients manage their own premises.  Moreover, unlike a school district or the central office of a company, these discreet client locations have no relationship to each other.

For example, at Gulf States vehicle processing center, Gulf States managers Randy Sartain and Terry Shaffer exercised control and authority over the Guardsmark guards, and gave instructions on how to keep track of the vehicles and how to fill out reports.  In fact, Birkner complained in her deposition that Mr. Sartain would scream at her for not pointing to the cars as she counted them.[36] Similarly, at the T-Mobile location, it was T-Mobile manager Charles Rafferty, and not a Guardsmark manager, who instructed Birkner at the beginning of her shift and told her that she could not enter the store and must guard the site from her car.[37]  He also

---

[36] Document No. 91, ex. 2 at 84:12-24.

[37] Document No. 91, ex. 2 at 211:24-25 & 214:13-15.

told her that she could leave around 9 a.m. when someone else showed up.[38]

The uncontroverted summary judgment evidence establishes other significant differences between this case and the "unusual circumstances" that make the school district line of cases an exception to the general rule. For example, the Dallas Independent School District had a single wage agreement negotiated for all custodial employees, regardless of the DISD school at which the employee worked. Guardsmark, however, negotiates contracts separately with each of its clients, which results in Guardsmark being paid different rates by different clients (and sometimes even by the same client) to provide various kinds of guard services at a variety of client locations and facilities. The revenues Guardsmark expects to receive from these commercially negotiated individual client contracts, the requirements for Guardsmark's performance of each individual contract, the expectations of the clients who specify the guards' job duties and who commonly supervise their performance, and Guardsmark's intended profit margin, all bear upon the rate that Guardsmark sets for payment of its non-supervisory guards, the same rate for both men and women, at any one client location. Guardsmark is in the business of selling guard services to clients, tailored to a client's security needs, whether that requires guarding the perimeter of a large

---

[38] Document No. 91, ex. 2 at 214:13-24.

complex, interfacing with visitors in an office setting, or sitting in one's car all night in a crime-prone neighborhood to guard a store under construction.    It is established in the summary judgment evidence that all of these factors influence the hourly rate that Guardsmark sets for a particular client establishment. Uncontroverted examples in the summary judgment record include a uniform hourly rate of $9.00 at Expeditor's facility, $10.00 at Toyota's vehicle processing center, $10.50 at Toyota's Executive Offices, and $12.00 at T-Mobile's store construction site during the night.

Birkner, citing Mulhall v. Advance Security, Inc., 19 F.3d 586, 591 (11th Cir. 1994), contends that all of Guardsmark's diverse client locations should be considered a single Guardsmark establishment because Guardsmark's administration, hiring, payroll, and assignments of jobs are centralized.  The plaintiff in Mulhall was vice president of administration for defendant, also a company that provided security services to customers around the country. In prosecuting her Equal Pay Act claim, she named as three of her eight comparators employees who were project managers working on two of the employer's government contracts, one in Nevada and the other in California.   The employer contended that the project managers, who were all paid more than the plaintiff, did not work at the same establishment, and therefore could not be considered for proof of a *prima facie* case.  The court distinguished Foster v.

15

Arcata Assocs., Inc., 772 F.2d 1453 (9th Cir. 1985), finding that
while both cases involved contracts to provide services to, among
others, armed forces facilities, in Mulhall "the project managers
*reported to plaintiff*."   Mulhall, 19 F.3d at 591 (emphasis in
original).

> Indeed, one project manager stated that he "was in
> continual contact with Ms. Mulhall concerning all aspects
> of [the employer's] operations . . . kept her fully
> briefed . . . sought her approval on all significant
> situations . . . seldom made any moves as project manager
> without first consulting Ms. Mulhall."

Id.  The court gave other examples, and concluded "that because of
centralized control and the functional interrelationship between
plaintiff and the [three] comparators, . . . a single establishment
exists for purposes of the EPA."   Id. at 592.

Birkner logically could rely on Mulhall if Birkner had been a
managerial employee in one of Guardsmark's offices and if the
security guards were required to report to her, but were being paid
more than she was as their supervisor.  It is not at all apposite,
however, to the facts of this case, for Birkner was simply one
among many guards and she was paid at the same rate as all other
guards at any given location to which she was assigned.  Here,
there was no "functional interrelationship" between Birkner and a
particular client post and other guards who worked at sundry other
client locations.  This case is therefore closer on its facts to
Foster v. Arcata Assocs., Inc., the case that the Mulhall court

16

distinguished.   <u>Foster</u> held as a matter of law that the employer
was not operating one establishment under the Equal Pay Act when it
negotiated from its corporate office two service contracts, one
with the Air Force for Nellis Air Force Base, Arizona, and the
other with the Army for Fort Ord, California, where "the day-to-day
contract performance occurred at the separate sites" and "[e]ach
office was independently managed for different customers . . . with
different operational needs."   772 F.2d at 1464-65.

Michael Thomas's uncontroverted deposition testimony was that
"each post has its own unique requirements and skills."[39]   Indeed,
Plaintiff has offered no summary judgment evidence to refute
Guardsmark's proof that it commercially negotiated with its clients
individualized guard service arrangements and contracts, which may
be in writing or oral, that different clients pay to Guardsmark
different hourly rates for guard services that are tailored to meet
the individual requirements of the clients at their own business
establishments, that the guards are operationally instructed and

---

[39] Document No. 91, ex. 4 at 141:17-25 (Thomas Depo.).  Birkner
claims that Guardsmark had one job description for all the guards,
citing to Guardsmark's website for support.  That website supports
the opposite conclusion: "[O]ur thorough evaluation process ensures
that we assign the right person to *each unique environment* and
prepare him or her to become a seamless part of your team. . . .
And they adapt to *each client's individual culture*."  See Document
No. 94, ex. 1 at 5 (emphases added).  Nowhere on the website cited
by Birkner does it say that there is one job description for all of
the guards.  It does say that all of the guards have to fill out a
"detailed 40 page application" and undergo drug screening and
background checks, *see* <u>id</u>. at 3.

supervised by the clients, and that the individual duties of guards at different client establishments can vary widely.

In sum, the comparison of one guard's hourly wage at one client's business location with the hourly wage of another guard at a completely different client business location is not a comparison of wages at a single establishment within the meaning of the Equal Pay Act.  The facts established in this summary judgment record therefore fall within the ambit of the ordinary rule, namely that an "establishment" refers to a "distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business.  Accordingly, each physically separate place of business is ordinarily considered a separate establishment."  29 C.F.R. § 1620.9(a).  Guardsmark is entitled to summary judgment on Plaintiff's Equal Pay Act claim.

## IV.   Title VII Discrimination in Compensation

Birkner also asserts that Guardsmark discriminated against her in violation of Title VII by paying her less because of her sex. Absent direct evidence of wage discrimination, Birkner must establish her case by circumstantial evidence under the McDonnell Douglas burden-shifting framework.  McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973).  Under this framework, the plaintiff must first create a presumption of unlawful discrimination by presenting evidence of a *prima facie* case.  After making this *prima*

18

*facie* showing, the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. <u>Lee</u>, 574 F.3d at 259. "This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." <u>Meeks</u>, 15 F.3d at 1019 (citations omitted). If the employer can articulate such a reason, the inference of discrimination falls away, and the burden shifts back to the plaintiff to establish that her employer's proffered reason is merely a pretext for discrimination. <u>Id.</u>

To establish a *prima facie* case of pay discrimination under Title VII Birkner must show that: (1) she is a member of a protected class; and (2) she was paid less than a nonmember for work that required substantially the same responsibility. *See* <u>Uviedo v. Steves Sash & Door Co.</u>, 738 F.2d 1425, 1431 (5th Cir. 1984). This analysis applies even when the two employees being compared worked at different times for the employer. <u>Id.</u>

Birkner, a member of a protected class, must produce evidence of a comparator who performed substantially the same job as she did and was paid more. Birkner points to one comparator--William Malholland, with allegedly commensurate experience--who was hired for $12.00 per hour on the same day that Birkner was hired for $10.00 per hour. Birkner was hired for the Gulf States Toyota vehicle processing center, where Guardsmark paid all guards $10.00 per hour, and the guard duties for that location are described

above at pages 2-3.  Guardsmark asserts, however, and Birkner does not contest, that Malholland was hired for a different location, which is not identified or described in the summary judgment evidence.[40]  Birkner has therefore failed to carry her burden to present evidence that Malholland was similarly situated to her.

Nonetheless, even if Birkner had been able to establish a *prima facie* case for Title VII wage discrimination, Guardsmark has articulated a legitimate, non-discriminatory reason for paying the guards at the Gulf States vehicle processing center at rates that may be different than the rates paid at other client locations:  Guardsmark negotiates contracts with each of its clients, and the contract terms frame the basis for the wages paid at the particular client's site.[41]  Part of the negotiating process that Guardsmark undertakes includes consideration of the requirements of the job for which Guardsmark's hourly rates are set in the contract, and this is factored into the hourly rates that Guardsmark pays to its guards at different contract locations.[42]  Therefore, Guardsmark has met its "exceedingly light" burden to articulate a non-sex based

---

[40] During oral arguments, Guardsmark's counsel represented that Malholland was hired for assignment at NRG, but nothing in the record reflects what the job entailed.

[41] *See* Document No. 111, ex. C ¶ 4 (Second Alba Decl.).

[42] <u>Id.</u>, ex. C ¶ 5.

reason for the differences in wages between client sites.[43]  *See*
Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1529
(11th Cir. 1992) (employer articulated a legitimate reason for
paying female buyer less than other male buyers because the
"company's budget was limited and it paid the plaintiff all it
could afford for the new position"); *see also* Lenihan v. Boeing
Co., 994 F. Supp. 776, 790 (S.D. Tex. 1998) ("[E]mployment
discrimination laws are 'not intended to be a vehicle for judicial
second-guessing of business decisions, nor . . . to transform the
courts into personnel managers.'" (citations omitted)).

Because Guardsmark has articulated a legitimate, non-
discriminatory reason for paying different rates at different
client locations, the burden shifts to Birkner to establish that
this reason is a pretext for discrimination.

Birkner has not met this burden.  She has failed to produce
any evidence to raise a genuine issue of material fact that the
legitimate, non-discriminatory reason set forth by Guardsmark for
paying its guards different wages at different client locations is
false or unworthy of credence or that the real reason was to

---

[43] In a Title VII wage discrimination case, once the plaintiff
has established a *prima facie* case, the defendant has the burden of
production, not persuasion, to articulate a legitimate, non-
discriminatory reason for its actions.  *See* Tex. Dep't. of
Community Affairs v. Burdine, 101 S. Ct. 1089, 1093 (1981) ("The
ultimate burden of persuading the trier of fact that the defendant
intentionally discriminated against the plaintiff remains at all
times with the plaintiff.").

discriminate against women.  Accordingly, Guardsmark is entitled to summary judgment on Birkner's Title VII wage discrimination claim.

## V.   <u>Retaliation</u>

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]. . . ."  42 U.S.C. § 2000e-3(a). Birkner must first establish a *prima facie* case composed of the following elements: (1) that she engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that there was a causal connection between her protected activity and the adverse action.  <u>Pierce v. Tex. Dep't of Crim. Justice</u>, 37 F.3d 1146, 1151 (5th Cir. 1994).  In the context of retaliation, however, an "adverse employment action" is defined more broadly than in discrimination cases; it includes any action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Aryain v. Wal-Mart Stores Tex. LP</u>, 534 F.3d 473, 484 & n.9 (5th Cir. 2008) (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S. Ct. 2405, 2415 (2006)).  If Birkner makes her *prima facie* case, the burden shifts to Guardsmark to proffer a legitimate, non-retaliatory reason for its actions, which then puts

the burden on Birkner to show that Guardsmark's reasons are a pretext for retaliation.[44]  To carry her ultimate burden, Birkner must show that the adverse action would not have occurred but for her protected activity.  Strong, 482 F.3d at 806.

Birkner establishes a *prima facie* case; she points to the protected activities of: (1) complaining to her account manager, Michael Thomas, and then to Guardsmark's Chief Diversity Officer when she called the 1-800 number provided in Guardsmark's diversity policy; (2) filing a discrimination charge with the EEOC on April 23, 2007; and (3) filing a statement with the EEOC contradicting Guardsmark's position statement on July 3, 2007.[45]  *See* Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003) (protected activity under Title VII includes making a charge, testifying, or participating in an investigation).  Further, she suffered an adverse employment action when Guardsmark terminated her on or about July 14, 2007, less than three months after Birkner filed her charge with the EEOC and only two weeks after her response to

---

[44] Because Birkner has not invoked a mixed-motive theory, her claim will be analyzed only for evidence of pretext.  *See* McCoy-Eddington v. Brazos County, No. H-05-0395, 2007 WL 1217989, at *4 (S.D. Tex. Apr. 24, 2007) (confining analysis to pretext when plaintiff neither pled nor argued for mixed-motive); Johnson v. Saks Fifth Ave. Tex., L.P., Civ. A. No. H-05-1237, 2007 WL 781946, at *21 (S.D. Tex. Mar. 9, 2007) (same); *see also* Nasti v. CIBA Specialty Chems. Corp., 492 F.3d 589, 595 (5th Cir. 2007) (concluding that the plaintiff waived consideration on appeal of a mixed-motive argument by failing "to present her mixed-motives claim to the district court in the first instance").

[45] Document No. 104 at 6-7.

Guardsmark's position statement.  *See* <u>Pegram v. Honeywell, Inc.</u>, 361 F.3d 272, 282 (5th Cir. 2004) (termination is an adverse employment action).  Because the adverse employment action occurred in close temporal proximity to the protected activity, causation may be inferred.  *See* <u>Swanson v. Gen. Servs. Admin.</u>, 110 F.3d 1180, 1188 (5th Cir. 1997) ("Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation.").

In response, Guardsmark meets its burden to articulate a legitimate, non-retaliatory reason for the discharge by stating that Birkner was terminated on or about July 14, 2007, because she had abandoned her post on the previous day.  *See* <u>Gerac-Ogashi v. Iberia Med. Ctr.</u>, No. 99-31412, 2001 WL 802696, at *1 (5th Cir. June 5, 2001) (unpublished op.) (abandoning one's post is legitimate, non-discriminatory reason for discharge); <u>Felan v. Runyon</u>, No. 93-8202, 1993 WL 503372, at *4 (5th Cir. Nov. 18, 1993) (unpublished op.) (leaving workplace without authorization and refusing a supervisor's instruction were legitimate non-discriminatory reasons for plaintiff's termination).

To demonstrate pretext, Birkner points to another incident involving a male Guardsmark security guard, "Joe," who wandered from his post to a basketball court on the client's property.  He was given a warning, Birkner argues, and was not terminated.  This

case and "Joe's" incident must therefore be compared for their similarities and differences. *See* Bouie v. Equistar Chems. LP, 188 F. App'x 233, 237 (5th Cir. 2006) (per curiam) ("[I]n order for circumstances to be nearly identical, the misconduct itself must be nearly identical."); Morrison v. Weyerhaeuser Co., 119 F. App'x 581, 586 (5th Cir. 2004) (finding no showing of pretext when plaintiff's and the other employee's infractions were distinguishable).

It is uncontroverted that Birkner and "Joe" had different supervisors, and their misconduct was at different client business locations. *Cf.* Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009) (holding that subordinates with different supervisors are generally not deemed to be similarly situated). Moreover, Birkner upon observing police investigating a break-in at her post, left the scene in her car and drove home, leaving her post *permanently*. The comparator "Joe" never left the client's premises to which he was assigned, and allegedly returned from the basketball court to his shift. Further, there is no evidence of burglary or of loss at the post to which "Joe" was assigned.

Birkner tries to characterize her infraction as merely leaving to go to the bathroom, which was permitted, but the uncontroverted facts are: she returned from her bathroom break, saw that the store had been burglarized, noticed that police were already there, and then abandoned her post by driving home without talking to the

police at the crime scene, and without permission to leave.  When
Adrain Rawls, her supervisor, called Birkner to find out where she
was and to request that she return to her post, *Birkner refused*.
There is a distinction between temporarily wandering away from and
then returning to one's post, and completely abandoning one's post,
which had become a crime scene.  Birkner fails to raise a fact
issue that she was disciplined more harshly for the same infraction
as another employee, and therefore fails to raise a fact issue on
pretext.[46]

In sum, Birkner has failed to raise a genuine issue of
material fact that the legitimate, non-retaliatory reason set forth
by Guardsmark for discharging Birkner is false or unworthy of
credence or that the real reason was because she had previously
contacted the EEOC and engaged in protected activity.  Accordingly,
Guardsmark is entitled to summary judgment on Birkner's retaliation
claim.

---

[46] Further, Birkner's admission that she could not "fault
Guardsmark" for terminating her after she abandoned her post
effectively eviscerates her retaliation claims.  Document No. 91,
ex. 2 at 194: 19-21.  In fact, Birkner actually testified that her
retaliation claim was based on "the way Randy Sartain treated me
and talked to me from the very first couple of days I was there
till when I left."  Id., 188: 3-5.  Randy Sartain, as related
above, was a Gulf States Toyota employee--*not* an employee of
Guardsmark--who supervised Birkner when she was assigned to the
Gulf States Toyota vehicle processing center.

VI.   Order

Based on the foregoing, it is hereby

ORDERED that Defendant Guardsmark LLC's Motion for Partial Summary Judgment (Document No. 87) is GRANTED, and Birkner's Equal Pay Act, Title VII compensation discrimination, and retaliation claims are DISMISSED.   Remaining for trial is Birkner's Title VII disparate treatment claim concerning her transfer.

The Clerk will enter this Order and send copies to all counsel of record.

SIGNED at Houston, Texas, on this 3rd day of May, 2011.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

27